USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/15/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RASHEIDA ALSTON,

Plaintiff,

-against-

MHANY MANAGEMENT, INC., ISMENE SPELIOTIS, and MARIE CHRISTINE SIMMONS,

Defendants.

23 Civ. 2080 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendants MHANY Management, Inc., ("MHANY"), Ismene Speliotis, and Marie Christine Simmons move for summary judgment on Plaintiff Rasheida Alston's claims of (1) race and disability discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C § 2000, *et seq*.; the New York State Human Rights Law ("NYSHRL"), NYS Executive Law § 296, *et seq.*; New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8 *et seq.*; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201, *et seq.*; (2) retaliation in violation of the ADA, NYSHRL, and NYCHRL; and (3) failure to maintain the confidentiality of disability-related information in violation of the ADA. *See* Mot., ECF No. 55; Mem, ECF No. 56; Opp., ECF No. 71; Reply, ECF No. 75. For the reasons stated below, Defendants' motion is GRANTED.

**BACKGROUND**

MHANY is a non-profit housing organization that provides affordable housing for low- and moderate-income New Yorkers. Defs. 56.1 ¶ 2.[1] From October 18, 2018, to October 1, 2020, MHANY employed Alston as its Chief of Staff. *Id.* ¶ 1. During Alston's employment,

[1] The Court uses "Defs. 56.1" to refer to Defendants' statement of undisputed facts pursuant to Federal Rule of Civil Procedure 56.1, with Plaintiffs' amended counterstatement. *See* ECF No. 65.

Speliotis was MHANY's Executive Director, *id.* ¶ 4, and Simmons was MHANY's fiscal director, *id.* ¶ 10.

I. Alston's Hiring

At the time that Alston was hired, MHANY had no Chief of Staff position. *See id.* ¶¶ 18–20. Alston learned from a high school friend that MHANY was interested in creating such a position, so she reached out to Speliotis by email. *Id.* ¶¶ 19, 21.

Prior to hiring Alston, Speliotis expressed that it would be great to hire a "person of color" for the Chief of Staff role. *Id.* ¶ 26.2; Speliotis Tr. 102:5–22, ECF No. 57-2. Alston is African American, Defs. 56.1 ¶¶ 26, 26.1, which Speliotis learned prior to offering Alston the job. *See id.* (dispute between Alston and Defendants as to whether Speliotis would have learned Alston's race upon seeing her resume or upon meeting her for an in-person interview).

Alston engaged in a multi-step interview process with MHANY. First, she submitted a resume, which showed that she had relevant Bachelor's and graduate degrees and "extensive work experience in various senior roles over a period of several years." *Id.* ¶ 24. Then, she met for an in-person interview with Speliotis and Olivia Leirer, an employee of an allied organization called New York Communities for Change who also performed some contract work for MHANY. *Id.* ¶¶ 26–28. During the interview, Alston, Speliotis, and Leirer discussed Alston's qualifications in detail for approximately one hour. *Id.* ¶¶ 29–30. Following the interview, Speliotis and Leirer asked Alston to submit a work plan explaining how she could use her specialized background to effectively perform the role of Chief of Staff. *Id.* ¶ 31. Speliotis and Alston discussed the work plan during "two or three" additional phone calls of 20–30 minutes each. *Id.* ¶ 33. Speliotis subsequently described Alston in an email as "dynamic and motivated and interesting" and "[n]ot a housing person . . . but wants to learn." *Id.* ¶ 34. She also sought

others' opinions on Alston's candidacy in that email and through conversations with two senior members of MHANY's Board of Directors. *Id.* ¶¶ 34–35.

Following this process, Speliotis hired Alston at a salary of $90,000, making her the third highest earning salaried employee at the organization after Speliotis and Simmons. *Id.* ¶¶ 36, 39–40.

II. <u>Alston's Pre-Pandemic Experience at MHANY</u>

Alston generally worked 35–40 hours per week or more at MHANY. *Id.* ¶ 45 (dispute as to whether Plaintiff worked 35–40 hours per week "[e]xcept for sporadic instances" or if she worked longer hours at certain periods). She did not work from home on any occasion. *Id.* ¶¶ 47, 47.1.[2] Her job description, provided upon hire, included overseeing projects and initiatives; recruiting, training, developing, and growing staff members; convening senior staff and Board meetings; and collaborating with other senior level staff to oversee daily management of the organization and setting its strategic plan. *Id.* ¶ 48. Alston performed duties at MHANY matching that job description. *Id.* ¶¶ 49, 49.1 (Alston's assertion that she "was able to perform those duties" albeit at a "mitigated" level). She directly and indirectly supervised 35–50 people, working most closely with maintenance staff responsible for responding to issues in MHANY's clients' residences. *Id.* ¶¶ 50–53. Alston's role was not public- or client-facing, she was not featured on MHANY's website or promotional materials, and she interacted with MHANY's Board only "a few times" while they were on site at MHANY's office and "between five and ten" times in the course of organizing special events. *Id.* ¶¶ 54–55, 61–62.

---

[2] Alston states that whether she "did not work from home on any occasion" is "[d]isputed." Defs. 51.1 ¶ 47. However, in support, she cites her own deposition testimony in which she responded "[n]o" to the question, "[P]rior to Covid did you ever, in fact, on any occasion work from home?" *Id.* ¶ 47.1 (citing Plaintiff Tr. 143:12–16). Alston also did not work from home after COVID-19, because she "did not perform work for MHANY in any capacity from March 4, 2020 until her termination." *Id.* ¶ 149. The Court, therefore, treats this fact as undisputed.

Alston worked closely with Speliotis, who is white. *Id.* ¶ 72.1. Speliotis sometimes addressed groups of employees, including white employees, using the term "folks." *Id.* ¶¶ 80–81; Panagopoulou Decl., Exs. R & DD, ECF Nos. 57-18, 57-30 (emails to MHANY's entire staff addressing them as "folks"); *id.*, Ex. EE, ECF No. 57-31 (text message to Simmons and Leirer, both white, plus a third employee, addressing them as "folks").[3] According to Alston, Speliotis also referred to Black and brown employees specifically with the distinct phrase "you folks" or "you people." Opp. at 19; Defs. 56.1 ¶ 80.1; *but see id.* ¶ 80.2 (arguing that "[f]olks was 'racially coded language because it was mainly directed at the Black and brown employees,'" without distinguishing between "folks" and "you folks"). Alston also recalls Speliotis (1) calling her "uppity" and "Ms. Perfect Perfect," *id.* ¶ 80.4, (2) saying that Black people like rap music, and (3) expressing her inability to tell the age of Black individuals. *Id.* ¶¶ 80.5–80.6.

Multiple times during Alston's employment, she informed Speliotis she was not feeling well, and Speliotis encouraged her to take the day off. *Id.* ¶ 85. Speliotis encouraged Alston to take time off for illness even when Alston had run out of sick days, telling her, "it's fine we will figure it out Don't worry Feel better." *Id.* ¶ 86.

Alston also interacted at work with Marie Christine Simmons, MHANY's fiscal director. Simmons is a white French woman who is "mostly" fluent in English but "occasionally phrases things in ways that a non-native English speaker would." *Id.* ¶ 79. Early in Alston's employment, Simmons refused Alston's request for an introductory meeting with two members of the finance team, which Simmons and Speliotis attribute to a looming audit deadline.[4] *Id.* at

[3] Alston states that whether "Speliotis occasionally addressed MHANY employees collectively as 'folks'" is "[d]isputed," but she does not dispute the contents of the exhibits where Speliotis refers to MHANY employees, including white employees, as folks. Because Alston does not dispute that Speliotis used this term of address for all MHANY employees on at least two occasions, the Court treats this fact as undisputed. *See* Defs. 56.1 ¶¶ 80–82.
[4] Alston disputes this justification but adduces no admissible evidence to support her position. *See* Defs. 56.1 ¶¶ 74.1–74.2. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985)

¶¶ 74–76. Believing Simmons did not want her team attending the introductory meeting and "for fear of losing [her] job," Alston did not renew her request for the meeting. *Id.* ¶¶ 77, 77.1. Alston also testified that Simmons once "yelled at [her] in front of the open office about something . . . Speliotis had specifically told [her] to do" and at other times, "waved her arm to dismiss [Alston]." *Id.* ¶¶ 13.3–13.4. Alston texted Leirer while still employed at MHANY, telling her that Simmons "said [Alston] speak[s] very loud," which Alston stated, "was [Simmons'] inner racist peeking out." Leirer Tr. 62:1–9, ECF No. 57-5. Leirer replied that she could "gently suggest some bias training" but acknowledged that "it may fall on deaf ears," *id.* 62:10–14, because Simmons would only be receptive to such a suggestion from Speliotis, her manager, *see id.* 65:7–21.

MHANY's Employee Handbook prohibits discrimination and contains both formal and informal complaint procedures for employees to address discrimination and harassment. Defs. 56.1 ¶ 14. The Handbook specifies that employees should notify the Chair of the Board of Directors if they want to make a complaint against the Executive Director (Speliotis). *Id.* Alston never made complaints of racial discrimination while employed by MHANY. *Id.* ¶¶ 42, 42.2.

Throughout Alston's employment, MHANY employed a predominantly non-white workforce. Out of the 126 MHANY employees from 2016–2021, 118 were members of minority groups and 55 identified as African American. *Id.* ¶ 66. Alston testified that she was the only non-white member of a six-person leadership team, *id.* ¶ 72.1, but does not dispute that

---

(A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." (internal citations omitted)).

five additional Latino staff members had job titles including "Director," "Manager," or "Supervisor," *see id.* ¶¶ 72, 72.1.[5]

III. Alston's COVID-19 Diagnosis, Furlough, and Firing

In March 2020, when the COVID-19 pandemic reached New York City, MHANY was fully operational with all employees working in person. *Id.* ¶¶ 87, 89. About 35–50 employees were present daily without masks in MHANY's office, which had an "open floor plan with desks and cubicles" and a "kitchen area where employees would go to make coffee and have lunch." *Id.* ¶¶ 90–92.

On approximately March 4, 2020, Alston was out sick from work and provided a doctor's note stating that she would return to work on March 10, 2020. *Id.* ¶ 95. Prior to taking sick leave, Alston "had been working in-person at MHANY's office," without a mask, "where she would frequently interact with employees and use communal facilities such as the bathroom and kitchenette." *Id.* ¶¶ 92, 102. On March 4, Speliotis texted Alston, "Rasheida, Are you ok? You didn't make it in and I am worried thanks." *Id.* ¶ 95.1.

On March 8, 2020, Speliotis texted Alston, "Rasheida Please stay home and take care of yourself!!!! Keep me posted! Take good care Please do not push it or rush particularly given what is going on." *Id.* ¶ 96.

On March 11, 2020, Alston texted Speliotis that she was still sick and "need[ed] to head to the ER." *Id.* ¶ 97. Speliotis responded, "Rasheida Please take care Given the existing crisis please take extra precautions With your health Keep me posted." *Id.*

---

[5] Defendants identify one African-American staff member in addition to Alston as a member of the leadership team. *Id.* ¶ 71. Her job title is "Lottery Specialist." *Id.* Construing all ambiguities in favor of Alston as the non-moving party, the record does not demonstrate that there were any Black members of leadership other than Alston.

On March 12, 2020, Speliotis texted Alston, "I haven't heard from you and going to presume you are still not feeling well Please do not rush back if you are not feeling well particularly given current crisis." *Id.* ¶ 98. Alston responded that she had pneumonia, and Speliotis replied, "Oh rasheida I am so sorry and hope you are being well cared for Where are you? And is there anything i can do? Please let me know." *Id.*

On March 15, 2020, Alston texted Speliotis that she was diagnosed with COVID-19, and Speliotis responded, "Rasheida That is what I was afraid of! How are you feeling? I hope you are receiving excellent care! Can i do anything?!" *Id.* ¶ 100. Alston replied, "Thank you for caring. I'm just concerned about [if] I might be able to work from home once they release me because I have to take care of my family and myself." *Id.* ¶ 101. Speliotis told her, "Please take care and we will figure something out Are you alone? Do you have support." *Id.*

On March 16, 2020, Speliotis texted Alston, "I hope you are feeling better ?!? I wanted to inform the staff but wanted to be accurate[.] Do you know or can they tell you when you might have started being able to pass the virus to others?" *Id.* ¶ 104. Alston did not respond. *Id.* ¶ 105.

A few hours later on that same date, Speliotis held an office meeting with MHANY staff, all of whom were working in-person (except for Alston), "to discuss people's concerns about COVID-19." *Id.* ¶ 106. During the meeting and "in response to questions about [Alston's] whereabouts," Speliotis disclosed that Alston had been diagnosed with COVID-19. *Id.* Later that day, Speliotis sent a follow-up email summarizing the meeting to MHANY staff and three employees of New York Communities for Change, which shared an office space with MHANY. *Id.* ¶¶ 107–08; Panagopoulou Decl., Ex. R. In response, MHANY staff members "expressed

concern about [Alston's] well-being and asked whether to send a package or a card" and some individuals reached out to Alston "to see if she was feeling okay." Defs. 56.1 ¶ 110.

Following Alston's receipt of Speliotis' email, Alston texted Speliotis, "Ismene, I just saw the email. I understand that you needed to alert the staff, but I would've appreciated if it could've been more discrete. That's a violation HIPAA policy." *Id.* ¶ 112. Speliotis responded, "Rasheida I am sorry I felt obligated to let staff know I don't know what discreet looks like given the current health crisis." *Id.* In the following days, Speliotis texted Alston twice more to apologize "for violating [her] privacy"; to ask "how [she could] begin to repair this"; to explain her reasons for feeling she had to disclose Alston's diagnosis to staff; to assure her that "[n]obody [was] talking about [her] . . . except to ask . . . if [she was] ok"; and to inquire about Alston's health. *Id.* ¶ 113. Alston did not respond to these messages. *Id.* ¶ 114.

On March 24, 2020, Speliotis reached out to Alston to ask how she was doing and when she anticipated returning to work. *Id.* ¶ 118. Alston responded that she could not return to work until mid-April. *Id.* ¶ 119. While Alston was on leave, MHANY kept her on payroll and applied her sick and vacation pay toward her wages, provided her with documents explaining how to apply for short-term disability benefits and additional paid sick leave under the New York State Paid Family Leave and the Families First Coronavirus Response Act, and made inquiries to determine if they could offer her any other benefits. *Id.* ¶¶ 121–22; Panagopoulou Decl., Ex. U, ECF No. 57-21.

Alston eventually informed MHANY that she could return to work on April 30, 2020. Defs. 56.1 ¶ 123. Speliotis responded that "there is not a huge amount of work to [do] remotely or otherwise" and that "it would be best if [she] applied for unemployment." *Id.* ¶ 124. After Alston inquired about health insurance coverage, Speliotis sent the following message:

> On the work front, as I mentioned there is no current work that I believe makes sense for you to do remotely. We can discuss this more as time goes on and the external environment changes. However, at this time, once you provide the documentation and we review it, I suggest that we put you on furlough so you can collect unemployment but still get health care.

*Id.* ¶ 126. Speliotis also included information about her potential eligibility for "additional benefits given the current crisis." *Id.* Simmons separately sent an email asking MHANY's Human Resources contractor for advice about Alston, stating, "Unfortunately we have no work for her at this time and we suggested to her to apply for unemployment insurance." Panagopoulou Decl., Ex. Y, ECF No. 57-25. Simmons also wrote, "In this case we are thinking to let her go but not as a furlough but as permanent as this position may not be needed any longer." *Id.*

At this time, MHANY was "experienc[ing] huge financial issues" because the pandemic eviction moratorium prevented MHANY from collecting rents from tenants, causing its "revenue [t]o drop[] below 30[%]." Defs. 56.1 ¶¶ 133–34. Since March 27, 2020, staff salaries had been reduced to 70% with very limited exceptions, and on that date, Speliotis had informed staff that they had "the option of stopping work at this time and going on unemployment." *Id.* ¶ 138. Over the course of the pandemic, construction and development projects "slowed down tremendously." *Id.* ¶ 135. Indeed, MHANY terminated its contract with Leirer early in the pandemic because there was no capacity for her to support its work, *id.* ¶ 140, and some MHANY employees were furloughed, *id.* ¶ 137.[6] Project managers and maintenance field

---

[6] The number of furloughed employees is disputed. Simmons testified that approximately 30 employees, comprising 50% of MHANY's workforce, were furloughed. Simmons Tr. 85:19–25, 86, ECF No. 57-4. Alston, however, reads Speliotis' testimony to indicate that "Speliotis could only identify three employees, including [Alston] . . . who were furloughed." *See* Defs. 56.1 ¶ 137.1; Speliotis Tr. 179:5–20 ("How many, approximately?", "At least two more. I'm not exactly sure how many, but I know for sure two.", "Okay. So, out of the whole staff, three people, possibly a couple more were furloughed . . . around the same time as Rasheida; right?", "I don't know the timing of it."). Defendants also point to a May 2020 email in which Simmons wrote, "Since 3/30/20 we let go 3.5 employees under the term of furlough," and suggest that Simmons mistyped 35 as "3.5." *See* Panagopoulou Decl., Ex. Y. But

supervisors continued working, but Speliotis testified during her deposition that the maintenance team "only performed emergency repairs" because of tenants' concerns about having workers enter their residences. *Id.* ¶ 141; Speliotis Tr. 171:3–12; Simmons Tr. 84:9–12.[7] MHANY was neither planning special projects or initiatives, training or recruiting staff, nor holding staff development meetings. Defs. 56.1 ¶ 143.

Nonetheless, based on (1) "observing some of [Speliotis'] other interactions and how she handles things," (2) "[Speliotis] not being responsive when [Alston] had shared that [she] was able to come back to work," and (3) the importance of the Chief of Staff role during a crisis, Alston claims that the furlough was retaliation for objecting to Speliotis' disclosure of her COVID-19 diagnosis. *Id.* ¶ 127.1 (citing Plaintiff Tr. 228:7–229:7, ECF No. 57-1).

On October 1, 2020, MHANY fired Alston and eliminated the Chief of Staff position. *Id.* ¶¶ 147–148. Alston had not performed any work for MHANY since March 4, 2020. *Id.* ¶ 149. Since Alston's termination, MHANY has not hired anyone to be Chief of Staff and no equivalent position has been created. *Id.* ¶ 151.

## LEGAL STANDARD

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v.*

---

Simmons could have also meant to type just "3," or "5," or "3–5." Resolving all ambiguities in favor of the non-moving party, the record does not establish that more than three total employees were furloughed. *See Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

[7] Alston disputes whether "[t]he maintenance team only performed emergency repairs" but does not offer any responsive evidence except Speliotis' statement in the same testimony that project managers and maintenance field supervisors were working. *See* Defs. 56.1. ¶ 141; *see also id.* ¶¶ 137.1–37.5. Alston acknowledged in her testimony that she had no knowledge of whether the maintenance staff were working during the pandemic. *See* Plaintiff Tr. 231:17–25.

*Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in [her] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). However, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citation omitted).

## DISCUSSION

### I. Race Discrimination Claims

Alston brings claims of race discrimination under Title VII, the NYSHRL, and the NYCHRL. *See* Am. Compl. at 10, 12, 14, ECF No. 40.

Title VII requires a plaintiff to show that "(1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). Under the Second Circuit's approach to the familiar *McDonnell Douglas* burden-shifting framework, a plaintiff whose employer proffers a legitimate reason for the adverse action may

prevail either by showing that the employer's stated reason for was pretextual or by "showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision." *Bart v. Golub Corp*., 96 F.4th 566, 573–74 (2d Cir. 2024).

For acts occurring prior to the effective date of the 2019 amendment of the NYSHRL, the standards for analyzing race discrimination under the NYSHRL and Title VII are the same. *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 274–75 (S.D.N.Y. 2024).

Claims brought under the NYCHRL and the post-amendment NYSHRL are subject to a more liberal standard. To show she is entitled to relief on these claims, a plaintiff must show that she has been treated "less well" because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 110 (2d Cir. 2013) (NYCHRL claims); *see also Lee*, 751 F. Supp. 3d at 275 (NYSHRL claims after amendment). The challenged conduct need not be a tangible adverse action such as hiring or firing. *See Lee*, 751 F. Supp. 3d at 275. "[U]nder the NYCHRL [and the NYSHRL], there are not separate standards for discrimination and harassment claims. . . . Instead, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based on a protected characteristic." *Johnson v. Strive East Harlem Employment Group*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (internal quotation marks and citations omitted); *see also Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 n.9 (2d Cir. 2025) (observing that the same standard is applied for the post-amendment NYSHRL as the NYCHRL). Federal civil rights statutes serve as a "floor below which the [these statutes] cannot fall," *Mihalik*, 715 F.3d at 110 (emphasis and citation omitted), so district courts must construe their "provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)); *see Simmons v. Akin Gump Strauss Hauer & Feld,*

*LLP*, 508 F. App'x 10, 13 (2d Cir. 2013) (explaining that the NYCHRL is "intended to provide a remedy reaching beyond those provided by the counterpart federal civil rights laws").

Even so, the NYCHRL is not a "general civility code." *Mihalik*, 715 F.3d at 110 (citation omitted). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.* Additionally, an employer "may prevail on summary judgment if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight." *Id.* at 111. Thus, courts may still dismiss "truly insubstantial cases," where the employer's defense is clear as a matter of law. *Id.*; *see also Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (2009) (assuring employers that "summary judgment will still be available where they can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences").

Applying the more generous NYCHRL and post-2019 NYSHRL standard,[8] Alston's race discrimination claims fail as a matter of law. Alston argues that she was hired as a "token" Black member of leadership and prevented from fully performing her duties. *See* Opp. at 1, 9, 13. But the only fact she points to in the record supporting this contention is Speliotis' admission that she "said that it would have been great if [the candidate hired to be chief of staff were] a person of color." Speliotis Tr. 102:5–19. Of course, even if Alston were hired because of her race—which the undisputed facts about her prior experience and interview process belie—being offered a job does not constitute being treated "less well." *See* Defs. 56.1 ¶¶ 24–40 (describing Alston's qualifications, multi-step interview process, and hire). And Alston's

[8] Because Alston's claims cannot overcome summary judgment under any applicable standard, the Court need not resolve which NYSHRL standard to apply to her claims regarding conduct that occurred during her October 10, 2018 to October 1, 2020 employment at MHANY. *See* Defs. 56.1 ¶ 1 (Alston's dates of employment).

testimony that she was permitted to perform her duties at only a "mitigated" level, without citing examples of how Defendants prevented her from fully performing her duties, is devoid of facts from which a reasonable jury could conclude that she was tokenized during her employment. *Id.* ¶ 49.1 (quoting Plaintiff Tr. 145:19–20); *see Fujitsu*, 247 F.3d at 428 (explaining that conclusory allegations cannot defeat summary judgment).

The comments from Speliotis and Simmons that Alston cites are similarly insufficient. The record demonstrates that Speliotis used the term "folks" for both white and minority employees. *See* Panagopoulou Decl., Exs. R & DD. Even crediting Alston's testimony that Speliotis used the phrases "you folks" and "you people" "mainly [for] Black and brown employees," Defs. 56.1 ¶ 80.2 (quoting Plaintiff Tr. 106:16–24), the addition of the "you", without more, does not support relief under the NYCHRL.

Alston relies on *Grimes-Jenkins* for the proposition that slight differences in the language used for white and non-white employees are actionable as race-based harassment under the NYCHRL, but the holding of that case is not so broad. *See Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.,* No. 16 Civ. 4897, 2017 WL 2258374, at *8 (S.D.N.Y. May 22, 2017), *report and recommendation adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017). In *Grimes-Jenkins*, "black women were referred to as 'going to the fields,' whereas white men were referred to as 'going to the job.'" *Id.* at *8. Because the language used for Black women was an "arguable reference to slavery," the magistrate judge concluded that plaintiff had stated a claim for relief under the NYCHRL, with the caveat that "[e]vidence of the context in which [the phrase] was used" might reveal "that supervisors [actually] referred to 'going into the field' . . . a term with no connotations of slavery." *Id.* at *8 n.11. Adding "you" to the word "folks" does not carry analogous racial connotations. And, in any case, *Grimes-Jenkins* analyzed the

plausibility of allegations in a motion to dismiss, not evidence on a motion for summary judgment. *See id.* at *1. The context here further undercuts any inference of discrimination: Alston could only identify four total white MHANY employees during her tenure, Defs. 56.1 ¶ 67, so the probative value of Alston "[not] ever witness[ing]" Speliotis address the few white employees on staff in this way is limited, *id.* ¶ 80.2.

The remaining facts Alston cites amount to instances of workplace criticism not connected to race, and two alleged comments in which Speliotis made generalizations about Black people.[9] Alston describes being "yelled at" and "dismiss[ed]" by Simmons and called "uppity" and "Ms. Perfect Perfect" by Speliotis. Opp. 4, 6; 56.1 ¶¶ 13.3–13.5, 80.4, 80.6. Because the NYCHRL is "not a general civility code," *Mihalik*, 715 F.3d at 113, Alston must adduce evidence not only of unpleasant treatment but also that the treatment occurred *because of her race*, which she fails to do. *See Walker v. New York City Transit Auth.*, No. 99 Civ. 3337, 2001 WL 1098022, at *7 (S.D.N.Y. Sept. 19, 2001). Similarly, in certain contexts, a reasonable jury could conclude that a white manager calling a Black employee "loud" was a pernicious racial stereotype. But here, Alston provides no evidence beyond her own unexplained interpretation of Simmons' comment that she "speak[s] very loud" as racist to justify such a conclusion. Leirer Tr. 62:1–9, ECF No. 57-5; *see Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("[T]he nonmoving party may not rely on conclusory allegations or unsubstantiated speculation."). Speliotis' two comments about Black people liking rap music and her inability to tell their ages, *see* Plaintiff Decl. ¶¶ 2–3, ECF No. 64-1, albeit generalizations based on race, were non-derogatory and not directed at Alston, and the record indicates that Alston did not

[9] Alston also briefly argues that her "furlough and termination give rise to a strong inference of discrimination" because she was both the only Black member of the leadership team and also the only member of the leadership team who was furloughed and terminated. Opp. at 19. As discussed below, the Court concludes that the record establishes Alston was furloughed and terminated because of MHANY's financial difficulties during the pandemic.

subjectively experience them as hostile.[10] *See* Plaintiff Tr. 98:15–19, 99:1–13 (after Alston was asked for "an exhaustive list" of times that she felt "there was hostility," she responded without mentioning these comments); *see Williams*, 872 N.Y.S.2d at 41 & n.30 (finding that sex-based comments, which were made on one occasion, were not directed at the plaintiff, and were not perceived by the plaintiff as "signal[ing] views about the role of women in the workplace" were nonactionable under the NYCHRL). Considering these remarks together with the other conduct Alston identifies, this is one of the rare cases in which an employer may prevail on summary judgment under the NYCHRL. *See id.*

Because Alston's evidence is insufficient as a matter of law to support a claim under the NYCHRL, her race discrimination claims under Title VII and the NYSHRL necessarily also fail. *See Mihalik*, 715 F.3d at 110 (explaining that the NYCHRL sets the lowest bar for plaintiffs). Summary judgment is, therefore, granted to Defendants on Alston's race discrimination claims.

## II. Disability Discrimination and Retaliation Claims

Alston brings disability discrimination and retaliation claims under the ADA, the NYSHRL, and the NYCHRL.[11] To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the

---

[10] Defendants argue that these two remarks should not be considered by the Court, arguing that they contradict Alston's deposition testimony in light of Alston's failure to mention them during her deposition. *See* Reply at 7. The Court disagrees that Alston's declaration necessarily contradicts her deposition testimony but concludes that the undisputed testimony establishes that Alston did not subjectively consider these remarks to be hostile. *See* Pl.Tr. 98:15–19, 99:1–13.

[11] Alston's Amended Complaint also alleges retaliation for protected activity opposing racial discrimination under Title VII, the NYSHRL, and the NYCHRL, *see* Am. Compl. ¶¶ 73–74, 97–98, but she opposes summary judgment on her retaliation claims exclusively by relying on her complaint that Speliotis disclosed her COVID-19 diagnosis. *See* Opp. at 32; *see also* Defs. 51.1 ¶¶ 42.1–42.3, 43 (acknowledging that Alston "did not complain about race discrimination through the formal process" or "to the Board of Directors" and citing only Alston's complaint about the COVID-19 disclosure to dispute the statement that Alston did not complain of discrimination). The Court, therefore, deems any race-based retaliation claims abandoned.

ADA; (3) plaintiff was qualified to perform the essential functions of the job; and (4) plaintiff suffered from an adverse employment action because of her disability or perceived disability. *See Capobianco v. City of New York*, 411 F.2d 47, 56 (2d Cir. 2005). Under the NYCHRL and post-amendment NYSHRL, the same standard applies for disability discrimination as for race discrimination: the plaintiff must show she was treated "less well" because of her disability. *See Mihalik*, 715 F.3d at 110; *see also Martinez v. Staten Island Univ. Hosp.*, 814 F. Supp. 3d 380, 401–02 (E.D.N.Y. 2026) (explaining impact of 2019 amendment of NYSHRL for disability discrimination). As with race discrimination claims, district courts must construe "the NYCHRL's provisions broadly," treating federal civil rights statutes proscribing disability discrimination as a floor, not a ceiling. *Mihalik*, 715 F.3d at 109 (internal quotation marks and citation omitted).

With respect to retaliation, the standards again differ for the federal, state, and city claims, but all require a causal relationship between the protected activity undertaken by the employee and the conduct alleged to be retaliatory. "[T]he elements of a retaliation claim under . . . the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quotation marks and citation omitted). Under the NYSHRL, a plaintiff must show she suffered an adverse action "because . . . she has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article." *Everett v. New York City Dep't of Educ.*, No. 21 Civ. 7043, 2023 WL 5629295, at *14 (S.D.N.Y. Aug. 31, 2023). Finally, "to prevail on a retaliation claim under the NYCHRL, the plaintiff must show

that she took an action opposing her employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted).

Alston cannot establish based on this record that the negative treatment she identifies as unlawful discrimination occurred "because of" her disability. *Id.* at 110. She, therefore, cannot overcome summary judgment on any of her disability discrimination claims, because even the broadest standard applicable under the NYCHRL requires this essential causal nexus. Alston first argues that Speliotis disclosed her COVID-19 diagnosis to the office, "humiliating her and isolating her from her colleagues," because "Speliotis wanted to shame [Alston] for her contraction of the feared virus." Opp. at 27. No reasonable juror could draw this conclusion merely from the fact that Speliotis disclosed Alston's identity instead of "alerting staff to potential exposure" more generally. *Id.* at 26–27. The undisputed facts demonstrate that Speliotis repeatedly expressed concern for Alston, *see e.g.*, Defs. 56.1 ¶¶ 96, 98, 100, 113, told Alston both before and after disclosing her diagnosis that she wanted to alert staff for safety reasons, *id.* ¶¶ 104, 113, disclosed her identity in response to questions from colleagues about Alston's whereabouts, *id.* ¶ 106, and apologized repeatedly for purportedly violating her privacy, *id.* ¶¶ 112–13. The record also establishes that employees were working without masks in the same open-plan office as Alston before her leave, such that it was reasonable for Speliotis and others to be concerned that Alston may have transmitted COVID-19 to other employees. *Id.* ¶¶ 90–92. The available evidence, therefore, indicates that Speliotis harbored no animus toward Alston regarding her COVID-19 status and disclosed Alston's disability out of reasonable concern for the safety of other employees. Alston's unsupported conjecture that Speliotis

actually "wanted to shame" Alston for her disability does not create a material dispute of fact. *See Fujitsu*, 247 F.3d at 428.

There is also no evidence in the record from which a reasonable jury could conclude that Alston was furloughed or terminated on the basis of her disability. To the contrary, it is undisputed that MHANY was "experienc[ing] huge financial issues" during the pandemic and that its "dropped to below 30[%]." Defs. 56.1 ¶¶ 133–34. During the first months of the pandemic, MHANY informed employees that they could stop working and go on unemployment and that MHANY furloughed employees in addition to Alston. *Id.* ¶¶ 137–37.1, 138. MHANY also ceased certain functions that were part of Alston's job description. *Id.* ¶ 143. Since Alston's termination, the Chief of Staff position no longer exists at MHANY, and no equivalent position has been created. *Id.* ¶ 151. Additionally, prior to the furlough decision but after learning Alston's positive COVID-19 status, Speliotis inquired when Alston anticipated "returning to work at MHANY," indicating that Alston's illness was not a barrier to her return. *Id.* ¶ 118. These facts all point toward the single reasonable conclusion that Alston was furloughed because of MHANY's financial difficulties and insufficient need for her position.

To counter this inference, Alston again offers only conclusory allegations and conjecture. She argues that Defendants' explanation that MHANY did not have work for Alston to perform was pretextual. But she cannot identify any specific tasks she could have performed, and instead relies on vague assertions that she could have "assist[ed] Speliotis in her dealings," performed "administrative tasks," done "thing[s] operationally," and "[sent] communications." Defs. 56.1 ¶¶ 47.2–47.4. Moreover, Alston concedes that she lacks knowledge of key facts about MHANY's pandemic operations upon which she bases her conclusion that the organization had work for her to perform. *See* Pl. Tr. 231:7–25 (Alston stating that she could have helped with

maintenance issues, then admitting that she did not know whether maintenance staff continued their duties during the pandemic); *see id.* 232:14–25, 233:1–9 (Alston stating that she could have "direct[ed] the staff" and "[kept] them abreast of certain organizational priorities," then admitting she did not know whether the staff she supervised pre-pandemic remained employed after March 2020). Alston's statements that MHANY had work for her to do are, therefore, "mere speculation or conjecture as to the true nature of the facts" which cannot "overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Summary judgment must be granted on Alston's retaliation claims for the same reason.[12] Alston argues that she was furloughed and terminated in retaliation for her complaint made to Speliotis about the disclosure of her COVID-19 diagnosis. *See* Opp. at 31–32. But, as stated, the record demonstrates instead that Alston was furloughed and terminated because of financial and capacity issues at MHANY. The record additionally contains messages from Speliotis to Alston apologizing for the disclosure of Speliotis' COVID-19 status, asking "how [Speliotis could] begin to repair this," and inquiring about when Alston anticipated returning to work in a message postdating the complaint. Defs. 56.1 ¶ 113. The only evidence Alston offers in support of her claim that the furlough was retaliatory is that Speliotis "[was] not . . . responsive" when Alston said she was ready to come back to work. *Id.* ¶ 127.1 (quoting Plaintiff Tr. 228:7–229:7).[13] In fact, Speliotis did respond to Alston. *Id.* ¶ 124. And, regardless, Speliotis' lack of

[12] Alston's Amended Complaint appears to allege retaliation for protected activity opposing racial discrimination, *see* Am. Compl. ¶¶ 73–74, 97–99, but she opposes summary judgment on her retaliation claims exclusively by relying on her grievance that Speliotis disclosed her COVID-19 diagnosis. *See* Opp. at 32; *see also* Defs. 56.1 ¶¶ 42.1–42.3, 43 (acknowledging that Alston "did not complain about race discrimination through the formal process" or "to the Board of Directors" and citing only Alston's complaint about the COVID-19 disclosure to dispute the statement that Alston did not complain of discrimination). The Court, therefore, deems any race-based retaliation claims abandoned.

[13] Alston also testified that she knew from "observing some of [Speliotis'] other interactions and how she handles things" that the furlough was retaliatory, but she offers no facts about the interactions to which she refers. Defs. 56.1 ¶ 127.1 (quoting Pl. Tr. 228:7–229:7).

responsiveness does not alone support a finding that MHANY retaliated against Alston for complaining about the COVID-19 disclosure. Alston has failed as a matter of law to raise a triable issue of fact as to a causal nexus between her complaint that her illness was disclosed and the alleged retaliatory conduct, a required element under all applicable legal standards. Summary judgment must be granted to Defendants on her retaliation claims.

III. Failure to Maintain Confidential Information

Alston's final claim is failure to maintain confidentiality of disability-related information in violation of the ADA. *See* Am. Compl. at 11. Under the ADA, an employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "Where an employer acquires information about an employee's disability, that information is to be 'maintained on separate forms and in separate medical files and . . . treated as a confidential medical record . . . .'" *Fleming v. State Univ. of New York,* 502 F. Supp. 2d 324, 328 (E.D.N.Y. 2007) (quoting 42 U.S.C. § 12112(d)(3)(B)). The disability-related information "may be divulged only to work supervisors where relevant to necessary restrictions or accommodations, to government officials investigating ADA compliance, or to first aid and safety personnel." *Id.*

Employers' obligation to maintain the confidentiality of disability-related information only applies if the information is obtained through a disability-related inquiry contemplated by the ADA, not when "the employee voluntarily discloses his health status during a 'friendly conversation.'" *Id.* at 337–38 (collecting cases). "A 'disability-related inquiry' is a question that is likely to elicit information about a disability, such as asking employees about: whether they have or ever had a disability; the kinds of prescription medications they are taking; and, the

results of any genetic tests they have had." *Conroy v. New York State Dep't of Corr. Servs*., 333 F.3d 88, 96 (2d Cir. 2003) (citation omitted). "[A]sking employees about their general well-being" and "whether they can perform job functions" are not disability-related inquiries. *Id.* (citation omitted).

Alston cannot show that MHANY violated the ADA by failing to maintain the confidentiality of her COVID-19 diagnosis because the record establishes that MHANY did not obtain the information via a disability-related inquiry. Speliotis never asked Alston for a diagnosis. Rather, she asked, "Are you ok? You didn't make it in and I am worried," and, when Alston said she had pneumonia, Speliotis responded with, "Where are you? And is there anything i can do? Please let me know." Defs. 56.1 ¶¶ 95.1, 98. These are plainly inquiries "about . . . general well-being," not questions that necessitate a response from Alston about the specifics of her illness. *Conroy*, 333 F.3d at 96; *cf. Fleming* 502 F. Supp. 2d at 338 (finding a disability-related inquiry because a supervisor "telephoned [the plaintiff] while he was in the hospital and asked him why he was there"). Speliotis also repeatedly asked Alston to "keep [her] posted," Defs. 56.1 ¶ 96, but, in context, these messages relate to ongoing uncertainty regarding when Alston would return to work and cannot be read as efforts to pressure Alston into divulging disability-related information. *See id.* ¶ 95.1 (March 4 text reading "Are you ok? You didn't make it in"); *id.* ¶ 96 (March 8 text reading "Keep me posted! … Please do not push it or rush"); *id.* ¶ 97 (March 11 response to Alston's text that she could not return to work on the planned date, with no updated estimate on her return, reading "Please take care . . . Keep me posted"); *id.* ¶ 98 (March 12 text reading "I haven't heard from you and going to presume you are still not feeling well."). Because MHANY did not learn Alston's COVID-19 diagnosis during the course of a disability-related inquiry, its failure to treat her positive COVID-19 status as a confidential

record is not actionable under the ADA, and summary judgment must be granted to Defendants on this claim.

**CONCLUSION**

Summary judgment is granted to Defendants on all of Plaintiff's claims. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, terminate all pending motions, and close the case.

SO ORDERED.

Dated: September 15, 2026
New York, New York

ANALISA TORRES
United States District Judge